Filed 8/25/15  P. v. Hargis CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DARYL HARGIS,<br><br>    Defendant and Appellant. | Consolidated Cases Nos.<br>F067352 & F068398<br><br>(Super. Ct. No. BF130354B)<br><br><br>**OPINION** |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>SARON GREEN,<br><br>    Defendant and Appellant. | F067598<br><br>(Super. Ct. No. BF130354A) |

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant Daryl Hargis.

Robert Derham, under appointment by the Court of Appeal, for Defendant and Appellant SaRon Green.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Larenda R. Delaini and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Daryl Hargis and SaRon Green  (Hargis and Green; collectively, defendants) were indicted by grand jury, along with other individuals, on multiple charges arising out of an incident in which a police officer was shot and wounded.  Prior to trial, the other individuals apparently resolved their cases.  Defendants were then tried together, but before separate juries.

Hargis's jury convicted him, as charged, of attempted murder of a peace officer engaged in the lawful performance of his duties (Pen. Code,[1] §§ 187, subd. (a), 664, subd. (e); count one), assault with a semiautomatic firearm on a peace officer (§ 245, subd. (d)(2); count two), attempted second degree robbery (§§ 212.5, subd. (c), 664; count three), conspiracy to commit second degree robbery (§ 182, subd. (a)(1); count four), and active participation in a criminal street gang (§ 186.22, subd. (a); count seven).  As to counts one through four, the jury found the offense was committed for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)), and that a principal in the offense personally and intentionally discharged a firearm, causing great bodily injury (§ 12022.53, subds. (d) & (e)(1)).  Hargis was sentenced to a total unstayed term of two years plus 57 years to life in prison.  His sentence subsequently was recalled, and he was resentenced to a total unstayed term of 16 months plus 57 years to life in prison.

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

2.

Green's jury convicted him, as charged, of premeditated attempted murder of a peace officer engaged in the lawful performance of his duties (§§ 187, subd. (a), 189, 664, subd. (e); count one), assault with a semiautomatic firearm on a peace officer (§ 245, subd. (d)(2); count two), attempted second degree robbery (§§ 212.5, subd. (c), 664; count three), conspiracy to commit second degree robbery (§ 182, subd. (a)(1); count four), possession of a loaded firearm in public by a gang member (former § 12031, subd. (a)(2)(C), now § 25850, subd. (c)(3); count five), and active participation in a criminal street gang (§ 186.22, subd. (a); count seven). As to counts one through four, the jury found the offense was committed for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)), and that Green personally and intentionally discharged a firearm, causing great bodily injury (§ 12022.53, subd. (d)). As to counts five and seven, the jury found Green personally used a firearm, and personally inflicted great bodily injury, in commission of the offense. (§§ 12022.5, subd. (a), 12022.7, subd. (a).) Green was sentenced to a total unstayed term of eight years plus 65 years to life in prison.

We consolidated defendants' appeals. We now hold: (1) the evidence was sufficient to support the attempted robbery convictions; (2) the trial court did not err by refusing to sever the gang counts and/or bifurcate the gang enhancements; (3) any error in admitting certain gang evidence was harmless; (4) section 654 does not require that sentence on count three be stayed; and (5) section 3051 removes any constitutional infirmity from defendants' sentences. Accordingly, we affirm the judgments.

## FACTS

### I

#### PROSECUTION EVIDENCE

*Evidence Heard by Both Juries*

On September 20, 2009, Richard San Miguel was living on Edmonton Street by the alley behind a 7-Eleven store.[2] Late that night, he was taking out the trash when he saw two men in hoodies. The movement caught his eye; there was rarely any activity in the alley at that time of night, and no one else was around. In addition, it was a warm night, and the men were wearing sweatshirts with the hoods up. The men quickly took off toward the 7-Eleven in response to the opening of San Miguel's garage door, and he called the police.

At approximately 11:30 that night, Bakersfield Police Officers Aleman and Stringer heard a radio call about several subjects wearing hooded sweatshirts being seen to the rear of the 7-Eleven between Stine Road and Edmonton Street, just south of Wilson Road.[3] The store's location was just down the street, and the officers responded to the parking lot just west of the store, in front of Cesar's Delicatessen. Both officers were in uniform; Stringer was driving their marked patrol vehicle.

Upon exiting the patrol vehicle, the officers found a walkway on the west side of the 7-Eleven, next to Cesar's Delicatessen, then a gate that led into an alley and parking area to the rear (south) of the 7-Eleven. Because the initial call stated a subject was seen going inside the business, Stringer decided to go toward the front of the store while Aleman checked the rear. They separated, but were never more than 15 feet apart.

Aleman saw a subject walking northbound toward the open gate. The person was wearing a dark-colored sweatshirt with the hood up, and his face was also covered. When he saw Aleman, he turned around and ran. He did not stop when Aleman told him to do so; Aleman gave chase. The person ran south toward the alley, then disappeared around a corner.

---

**2**    Unspecified references to dates in the statement of facts are to the year 2009.

**3**    It was warm enough that evening that Aleman and Stringer were wearing short-sleeved shirts.

Aleman's attention was drawn to his left (east) by movement that turned out to be a subject running east toward where the alley intersected Edmonton Street. It appeared the person was going to turn south. Aleman saw this person only briefly and could only describe him as wearing a dark-colored sweatshirt.

Aleman's attention was immediately caught by a third subject about 10 feet to his left. This person — Green — was also wearing a dark-colored sweatshirt. He had his hood up and his face covered. He was standing at an angle and bringing up a pistol and pointing it at Aleman. He fired, and the bullet struck Aleman in the left thigh. Aleman went down to one knee, drew his weapon, and fired multiple shots as Green turned and ran.

Aleman was out of Stringer's field of vision when Stringer heard him yell, "stop." As Stringer turned around, he heard a gunshot from a smaller caliber weapon than the .40-caliber firearms the officers were carrying. Stringer saw Aleman go down on one knee, raise his firearm, and begin firing. Stringer ran in Aleman's direction until he could see Green, who was wearing dark-colored clothing and a hooded sweatshirt.[4] Although Green was moving away in a sideways run, he still had a firearm directed at Aleman. Stringer began firing. Green turned and began to run, but was shot several times and fell to the ground in the alley. He dropped his firearm when he fell. The gun, a .380-caliber semiautomatic pistol, contained three rounds of ammunition in the magazine and one live round in the firing chamber.

Meanwhile, Bakersfield Police Officers Abshire and Cason also responded to the 7-Eleven. Abshire dropped Cason off on the southwest corner of Wilson and Stine so he could set up a perimeter if the subjects ran west through the alley. Abshire had originally planned to set up the east perimeter on Edmonton in case the subjects ran east through the

---

[4]     At the same moment he saw Green, Stringer also saw the third individual. That person was running eastbound, and continued on out of the alley.

alley, but exited her vehicle when she heard one gunshot that sounded like a pop, followed by a succession of multiple gunshots that were louder than the first shot. Stringer radioed that there was an officer down and three subjects, one running east, one running west, and one down.

Abshire ran south on Stine to the west side of Cesar's Delicatessen and peeked around the corner into the alley. She saw Stringer and Green farther down the alley. Green was on the ground. She also saw a male subject — Hargis — wearing a light gray sweatshirt with a hood pulled over his head, running southbound and making a westbound turn into the alley. He appeared to be trying to stay low to the ground while he was running. Abshire stepped out from behind the building and began running toward him. At some point, she drew her firearm. She told him to get down on the ground. Eventually, he went prone on the ground. She holstered her weapon and handcuffed him. She did a quick "protection sweep" of his body to make sure he did not have any concealed weapons. She found none and had not seen or heard him drop or throw anything. However, parts of a BB (replica) gun were found near his location in the alley.[5] The device was not operational.

Aleman suffered an entry wound on the upper inside thigh. The bullet traveled through his leg, passing within millimeters of his femoral artery, and exited his left buttock. Ten .40-caliber shell casings and one .380-caliber shell casing were located at the scene.

---

[5]     Stringer first saw Hargis rounding the corner of the business to the west of the 7-Eleven. Hargis was running in a westerly direction, and Stringer lost sight of him. As Stringer was advancing toward Green after Green was on the ground, Hargis came back into Stringer's field of vision. Stringer ordered him to get down. Hargis got on the ground and announced he was down. Hargis also threw something on the ground. Stringer was aware Cason and Abshire arrived at some point, but did not see them take Hargis into custody.

6.

In addition to the hooded sweatshirt, Hargis was wearing a tied bandanna partially covering his chin and neck area. A tied blue and white bandanna was found among clothing cut off Green by medical personnel at the scene. A black knit ski mask was found along Edmonton Street, between some bushes. A black hooded sweatshirt was found on Treanna Avenue, off Edmonton Street. In the front pocket were two socks and a pillowcase.

<em>Evidence Heard Only by Hargis's Jury</em>

On September 21, Bakersfield Police Detective Eddy spoke with Green at Kern Medical Center. Green related that he grew up in the East Side Crips neighborhood, and that he had been an East Side Crip for several years. Green explained that nearly all his friends were East Side Crip members, as were a number of his family members. He named some of them; Eddy was familiar with them and knew them to be East Side Crip members. Green also said the gang's color was royal blue, and he named the different subsets of, or cliques within, the East Side Crips. One was the Spoonie G's, of which he said he was a member. Another was the Project Crips, with whom he said he was associated. Green related that he had been shot at on three different occasions. He named two of those he said had shot at him; one was a Country Boy Crip, and another was a West Side Crip. Green said he would not go to particular areas of town because of his gang affiliation. Asked if he had any gang-related tattoos, Green pointed to a tattoo on his arm that looked like a Chevrolet emblem with "805" in it and "Kern County" written in script within the tattoo.

Bakersfield Police Detective Mills interviewed Hargis several hours after the incident, and again two days later. During the first interview, Hargis was wearing blue shoes and shorts.

During the first interview, Mills was trying to ascertain the identity of the third individual who was not apprehended at the scene. Mills ultimately determined this person was Kristopher Fanning. When Mills asked Hargis if the person was Kristopher

7.

Fanning, however, Hargis gave a physical description and said the person's name was Josh. Hargis added that this person was most likely an East Side Crip, because he was an associate of Green, who was Hargis's cousin and an East Side Crip before he moved to Santa Maria. Hargis said Josh was the mastermind of the plot to rob the 7-Eleven. Hargis said they walked to the store from the bus terminal. While they were walking, Green showed Hargis that he had a firearm. They all had on hoodies, with bandannas around their necks to be pulled up over their faces. Hargis had a BB pistol. Josh went back and forth from the rear of the store to the front several times to see how busy the store was. Josh said they should rob the customers as well as the store.[6]

During the second interview, Hargis said they got a ride from Geneva Fanning, who was Hargis's girlfriend and Josh's (Kristopher Fanning's) sister. Hargis said she parked east of the store, just south of the alley, and waited in the car. Hargis said they did not rob the 7-Eleven because the police came.

Hargis first related that when the police arrived and confronted them, Hargis lay down and discarded his BB pistol, and heard shots being exchanged between the police and Green. Later, he said Green shot at the officer first and the officer returned fire. In the second interview, Hargis said the officers shot Green first and Green fired back in self-defense.[7] Hargis said the BB gun he had did not work. Also in the second interview, Hargis changed from saying they were going to rob the 7-Eleven, to saying they were there to meet someone to buy marijuana. Because Green did not trust the seller, Hargis had the BB pistol to scare the person if things did not go right. Hargis said he was wearing a hooded sweatshirt because it was cold.

---

[6]     At one point, Hargis called Josh "Chris," but said he had misspoken.

[7]     By the time of the second interview, the Fannings had been arrested. During this interview, Hargis confirmed the identities of his accomplices.

8.

Bakersfield Police Officer Ronk testified as a gang expert. He explained that the East Side Crips was by far the largest Black gang in Bakersfield, with close to 1,000 members. Members associated with the color royal blue, and had particular hand signs that they used for identification. Rival gangs were the West Side Crips, the Country Boy Crips, and the Bloods. Some of their primary activities were murder, robbery, theft-related incidents like auto theft, and narcotics transactions. They also liked to engage in witness intimidation. There were various subsets of the East Side Crips, which were simply smaller geographical groups within the larger boundaries of the gang as a whole.

Ronk explained that in gang culture, including that of the East Side Crips, reputation was basically respect, and respect was how the gang was structured. Someone who had more respect had more rank within the gang. Thus, when a crime was committed by the gang, respect was the ultimate goal of the crime. Different types of crimes garnered different degrees of respect, with crimes such as robbery, assaults with firearms, and murder resulting in greater respect from fellow gang members. Ronk could think of no greater respect symbol than murdering a police officer.[8]

According to Ronk, the East Side Crips were engaged in a continuing pattern of criminal conduct. Based on his training, experience, and conversations with members of the gang and of the community, he opined this fact was common knowledge to members of the gang and of the community.

Ronk explained that, in rendering an opinion whether a crime was gang related, he considered four things with respect to the offense itself and three things with respect to the offender. With respect to the offense, he looked at whether it was a primary activity

---

[8]     Ronk was shown a photograph of Anthony Hodge, an East Side Crip with whom he was familiar. Hodge had tattoos on his abdomen that read "Fucc the police," "187" (the Penal Code for murder), and "BPD." Ronk explained that the odd spelling was the result of Crips not putting "c" and "k" together, because "ck" meant "Crip killer" to Bloods and was used to show disrespect toward Crip gangs.

of the gang, particularly whether it was something that would benefit the gang (for instance, burglary of a residence that might result in procuring firearms, or an offense that would intimidate the public); whether the offense was committed alone or with a group, because involvement of a group increased the chances of success and the brazenness of those involved, and allowed those involved to witness the actions of the others and report on that to the gang, thus giving more credence and respect, and also allowed more experienced gang members essentially to train newer members; who was involved in the crime, and were any of the people gang members; and the manner in which the participants chose to carry out the offense (for instance, by wearing a symbolic mask or bandanna, or colors that represented a gang and so identified and spread the word about what gang committed the crime). With respect to the perpetrator, Ronk looked at what the person said (for instance, did he or she admit to being a gang member or somehow show, in conversation, gang affiliation); whether the person's actions spoke louder than his or her words (for instance, if the person denied being a gang member but was wearing gang clothing, doing a primary offense of the gang, or associating with gang members); and with whom the person associated (for instance, if the person continually chose to surround him- or herself with gang members or nongang members).[9]

Ronk explained that firearms were a respect symbol within the East Side Crips. Because a lot of the gang's members were not allowed to have firearms because of their criminal past, those who possessed firearms were respected. Because a firearm could be used for offensive and defensive purposes, the members who possessed one were the ones who were called on to resist, or to defend the gang's territory from a rival gang's encroachment.

---

[9]     Ronk explained that every member of a criminal street gang was an associate. Members were those who chose to become active participants in criminal behavior.

Ronk opined that Geneva Fanning and Kristopher Fanning were active members of the East Side Crips.[10] Geneva Fanning pled guilty to participation in a criminal street gang, namely the East Side Crips. Kristopher Fanning was depicted in photographs displaying knowledge of the East Side Crips and the Spoonie G subset, wore clothing representative of the East Side Crips, and had engaged in criminal activity with others that was indicative of East Side Crip membership. His moniker was "Lil' Bone."

Based on Green's conversation with Eddy, Ronk also opined Green was a member of the East Side Crips. In addition, Green had an "805" tattoo on his forearm. The number was the old area code for Kern County. Ronk had never seen that tattoo worn by a nongang member. Green's moniker was "Maniac."

Hargis (with whom Ronk had had contact in the past) associated himself with members of the East Side Crips prior to the date of the charged offenses. For instance, he was contacted with Karl Fanning, Kristopher Fanning's brother, who was a member of the East Side Crips and had been arrested for several gang-related offenses.[11] In addition, Geneva Fanning, an admitted member of the East Side Crips, was Hargis's girlfriend. In Ronk's opinion, the moment Hargis actively participated in the charged offenses, he moved from merely being an associate to being an active participant and a member. In addition, when Hargis initially was booked into custody in this case, he did

---

[10] The parties stipulated that the ski mask recovered in this case was tested for DNA. Both defendants were excluded as contributors. However, Kristopher Fanning's DNA profile was located on the item.

[11] In 2006, Karl Fanning was arrested in the company of Brian Brookfield for stealing a car. Brookfield, a member of the East Side Crips, murdered someone in West Side Crip territory a month later. Just prior to the stolen car incident, Karl Fanning, Kristopher Fanning, Brian Brookfield, Gerald Ward, and another person were in a car in which two firearms were located. Ultimately, Kristopher Fanning admitted shooting at a Country Boy Crip's house. In Ronk's opinion, Karl Fanning was a member of the East Side Crips.

11.

not claim affiliation. When he was moved to the jail in 2011, however, he asked to be housed with Crips.

Ronk explained that an East Side Crip would not commit a violent crime with someone who was not a member of that gang. Such crimes carry the most risk, and so a gang member would commit them with someone he or she could trust, namely, another member.

Ronk testified concerning offenses that were unrelated to this case but committed by East Side Crip members. On January 21, Tyrone Pogue and four others were in a vehicle. Police tried to conduct a vehicle stop in the area of Roy's Market. As the vehicle stopped, Pogue ran. He was later arrested and found to be in possession of a firearm. All five who were in the vehicle were convicted of either possession of a firearm, gang enhancements, or being an accessory. In Ronk's opinion, those offenses were committed in association with a criminal street gang.

On December 11, 2007, police found Mikko James, a West Side Crip, who had been shot and killed. Police determined Jake Ward, an East Side Crip, had killed James in retaliation for James having killed Joshua Ward, another East Side Crip. Shortly after, Hargis was in the traditional boundaries of the East Side Crips when he was the victim of a drive-by shooting.

In response to a hypothetical question based on the prosecution's evidence in the present case, Ronk opined the offense was committed in association with known, admitted members of the East Side Crips, and was committed for the benefit of, in furtherance of, or in association with the East Side Crips. Ronk pointed to the involvement of four people; the gang-related clothing; the bandanna around the face, a "bold statement"; the fact everyone involved had a job; the manner in which the offense was committed, with a subject being "brazen enough to point a firearm at a police officer and shoot that police officer point-blank face-to-face"; and the fact robbery was a primary activity of the East Side Crips and so the perpetrators would gain respect from

12.

the offense. The gang would benefit through the notoriety they would gain in the public and the intimidation factor. Ronk explained that shooting a police officer was "in a category of its own" because it did not happen very often. It was "the ultimate thing" a gang member could do for a gang.

*Evidence Heard Only by Green's Jury*

Eddy spoke to Green about gang membership. Green related that he had grown up on the east side of Bakersfield since he was seven years old. He said he was living in Santa Maria currently, but came home every weekend and returned to the east side, on Kincaid Street, with his mother. Green named all the streets on which he had lived; Eddy knew them to be within East Side Crip territory.

Green said all his friends were East Side Crips, as were a number of his relatives, and he named some of those people for Eddy. Green said he was a member of the Spoonie G clique of the East Side Crips, and that he also associated with another East Side Crip subset, the East 11th Street Project Crips. He explained that he grew up around the gang and so was allowed to be a member without being jumped in. He named the various subsets of the East Side Crips. He related that the gang's color was royal blue, and talked a little about his involvement in the gang, including how he had been shot at on at least three different occasions by members of rival gangs, including the Country Boy Crips and the West Side Crips. Green stated he stayed away from Country Boy Crip and West Side Crip neighborhoods. Asked if he had any gang-related tattoos, Green pointed to a tattoo on his forearm in the shape of a Chevrolet emblem with the number 805 and "Kern County" on it.

Eddy asked about what happened in this present case. Green said he had been at his girlfriend's residence on Actis Street, just around the corner from the 7-Eleven, when he decided to go to the store to get a soda. He made his purchase, then when he was walking out of the store along the west of the business in the back, he saw someone he recognized as Little Kris, i.e., Kristopher Fanning. Kristopher Fanning was smoking a

13.

marijuana cigar known as a blunt, and the two shared it behind the store. Someone Green knew as Daryl was standing nearby.

Green related that while he was smoking the blunt with Fanning, he saw a police officer walking quickly toward him along the side of the business. The officer pointed a gun at him and told him to get his hands up. Green said he reached into his pocket to get a dollar out, to show the officer he had a dollar. When he started reaching in the pocket, the officer shot at him, so he started to run. The officer then shot him again, and Green started to go down. As he did so, he saw a .380-caliber firearm on the ground. He tried to tell the officer it was not his.

When Eddy explained a gunshot residue test had already been done on Green's hands and, as a ruse, stated gunshot residue had been found, Green responded that he had fired a shotgun earlier in the day. Asked if his fingerprints or DNA would be found on the .380, Green replied that he had had a .380 two months earlier, and it was possible the gun found could have his DNA if it was the same .380 he had owned a couple months earlier.

Ronk testified as a gang expert. He explained that the actual number of members of the East Side Crips was unknown, but it was by far the largest Black gang in Bakersfield, with close to 1,000 members. Rival gangs were the West Side Crips, the Country Boy Crips, and the Bloods. The East Side Crips got their start from gang members who came from Los Angeles, so a number of East Side Crip members had family members in Los Angeles.

Ronk explained that the East Side Crips associated with the color royal or dark blue. The color was utilized as an identifier, so that, when committing a crime, members of the gang could identify other members, and people familiar with gang styles would know that gang was committing the crime. Ronk explained the East Side Crips also used certain hand signs to identify themselves.

14.

Ronk explained that the East Side Crips had five subsets, known within the gang as the five nations. The subsets were smaller groupings, by geographical area, within the large territory of the East Side Crips. Kristopher Fanning and Green were from the Spoonie G subset.

According to Ronk, the primary activities of the East Side Crips were shootings, robberies, burglaries, theft-related offenses, and narcotics transactions. They also liked to engage in witness intimidation and auto theft. Ronk explained that committing such crimes elevated an individual's reputation among other members of the gang. The more crimes an individual committed, the more status that person gained within the gang, so the more say that person would have as to what went on in the gang. Within the gang, people with more respect had more rank. Different crimes yielded different amounts of status; murdering a police officer would be "the ultimate" in that regard. The ultimate level of respect a person could get among the East Side Crips would be to shoot a cop.[12]

Ronk gave examples of other offenses committed by East Side Crip gang members that were unrelated to this case. On September 11, 2007, Jake Ward, an East Side Crip

---

[12] The jury was shown a photograph of Anthony Hodge, whom Ronk had arrested in the past but who had no specific involvement in this case. According to Ronk, Hodge was affiliated with the East Side Crips. On his abdomen were the tattoos "Fucc the police," "187," and "BPD." Ronk explained that 187 was the Penal Code for murder, and that "Fucc" was spelled that way because Crip gangs will not use "ck." "Ck" stands for Crip Killer and is a sign of disrespect among Blood gang members for Crips.

In response to defense counsel's question why Hodge would have a "Fucc the police" tattoo, Ronk explained there was a mindset among East Side Crips, who were taught from a very young age that resistance against the police was important, and that if East Side Crip members engaged the police and another East Side Crip did not help them out, it was a sign of disrespect. Therefore, resistance to the police was almost expected. As an example, Ronk described how, shortly before trial, he got into a confrontation where he had to expedite units, because a "mob" of East Side Crip members started gathering and he thought he was "going to get lynched." Ronk related that because Hodge had the tattoo but was arrested without a fight, he was beaten up in prison, as he had a tattoo representing a certain way, but then "chickened out in the end."

15.

member, shot and killed Mikko James, a West Side Crip, in retaliation for James murdering Ward's cousin a year earlier. Ward was convicted and sentenced to prison. In Ronk's opinion, the offense was committed for the benefit of, in furtherance of, or in association with the East Side Crips.

On January 21, Tyrone Pogue and four others were in a vehicle. When police officers tried to stop the vehicle, Pogue ran from the vehicle in front of Roy's Market, which was in the middle of East Side Crip territory. He was caught and found to be in possession of a firearm. All those in the car were convicted of firearm possession or being an accessory. In Ronk's opinion, the offense was committed for the benefit of, in furtherance of, or in association with the East Side Crips.

Ronk explained that firearms were very significant in the gang. Because they were not easy to obtain lawfully if someone had a felony record, they usually were procured by criminal means, such as residential burglary, and then distributed among the gang's members. Firearms were also a status symbol; the person with the firearm was the one who was expected to defend the gang and take action against a rival gang.

According to Ronk, the East Side Crips engaged in a continuing pattern of criminal conduct. Based on his training, experience, and conversations with members of the gang and of the community, that fact was common knowledge to members of the gang and the community.

In determining whether an offense was gang related, Ronk considered four things. The first was the type of offense and whether it was a primary activity of the gang. The second was whether the offense was committed by an individual or a group. With a group, the chance of success was increased, the group could multitask, the group could adapt more easily to unexpected contingencies, and other members could watch the activities of the people involved in the crime, such as older or more experienced members taking younger members along. In addition, there was the intimidation factor where a group was involved. The third factor was who committed the crime, particularly if those

16.

individuals were admitted, documented, or known gang members. The final factor was the manner in which the crime was committed, including whether the participants wore gang clothing or something symbolic such as a colored bandanna.

With respect to the present case, Ronk found it significant that a group of at least three people implemented a plan by arriving on scene with dark clothing and bandannas on their faces, and armed with readily identified firearms.[13] The group came prepared to do a primary activity of the East Side Crips wearing the colors of that gang.

With respect to the perpetrators themselves, Ronk looked at three factors. First, did the people admit gang affiliation? Second, did their actions speak louder than their words? And third, with whom did they associate?

Ronk found it particularly significant that Green admitted gang membership. In addition, a lot of older gang members tended to have an "805" tattoo, and Ronk had never known a nongang member to have that tattoo. Green's moniker — the name given him by the gang or that he earned — was "Maniac." In addition, when being booked into custody, Green claimed affiliation with the East Side Crips. Taking everything into account, Ronk opined that Green was an active member of the East Side Crips at the time of the present offense.

With respect to Hargis, his gang affiliation was determined by the people with whom he associated, his involvement in this case, and his involvement in things after this case. Although initially, Hargis did not want to be housed with anyone separately while in custody, in 2011, he requested to be housed with Crips. While Ronk considered Hargis "definitely" an associate of the East Side Crips, there was not enough evidence, in terms of the factors Ronk identified, to say he was an active member. The moment

---

**13** To Ronk, it did not matter whether the firearm was real, because it would be perceived as real by the victims.

Hargis chose to become an active participant in the charged crimes, however, he became an active member.

Hargis opined that Kristopher Fanning was an active member of the East Side Crips.[14]  Kristopher Fanning had been arrested for primary activities of the gang, he had been arrested in the company of several associates, and there was a photograph of him throwing up the Spoonie G sign and wearing Spoonie G colors.

In response to a hypothetical question that tracked the prosecution's evidence in this case, Ronk opined the offense benefitted the East Side Crips, or at least was in association with gang members.

## II

### DEFENSE EVIDENCE

### *Evidence Heard by Both Juries*

Jeanne Spencer of the Kern Regional Crime Laboratory examined a gunshot residue kit taken from Green two hours and 41 minutes after the incident.  She did not detect any gunshot residue.[15]

The parties stipulated two ballistic items were analyzed by the Kern Regional Crime Laboratory.  The first, a .380 shell casing, was found in the alley behind the 7-Eleven.  The second, a bullet, was located along the east wall of the delicatessen next to the 7-Eleven.  Chris Snow of the Kern Regional Crime Laboratory compared the bullet to

---

**14**     The parties stipulated the black ski mask recovered in this case was tested for DNA.  Both defendants were excluded as contributors to the DNA.  However, Kristopher Fanning's DNA profile was found on the ski mask.

**15**     The laboratory will only examine a kit taken from a live individual within three hours of when the firearm was used, because gunshot residue — which is simply a light powdering on the hands that will be lost with any sort of movement or washing of the hands — is not expected to be found on a live individual after three hours.  Even if the sample is collected within three hours of when the firearm was used, there is no guarantee gunshot residue will be present in the sample.

18.

some test firings made with the .380-caliber pistol in this case. He determined the test fires and the bullet evidence were fired by the same firearm.

*Evidence Heard Only by Hargis's Jury*

Bakersfield Police Officer Ursery was assigned to the Gang Unit when this case was first investigated. In part, he interviewed Tryrone Berry, an East Side Crip whom Ursery had known for some time. Asked if Kristopher Fanning was a gangster, Berry responded affirmatively. Asked if he considered Green to be an East Sider, Berry said he considered Green to be associating with the East Side Crips. Asked if he considered Hargis to be an East Sider, Berry replied, "no. He is a square. He doesn't gang-bang."

Nevertheless, Ursery rendered an opinion to the grand jury as an expert that Hargis was an active member of the East Side Crips. During his investigation, he did not find that Hargis had a moniker, and did not document any tattoos. However, he found a number of things that contradicted Berry's position on the matter, particularly Hargis's association with the Fannings and Green, all of whom were active members of the East Side Crips. In Ursery's opinion, Hargis associated with the East Side Crips until the current offenses, whereupon, as a result of his commission of the crimes with known gang members, he became an active participant in the gang.

Shanika Hargis, Hargis's sister, was in the kitchen one day in December 2007, cooking dinner with Hargis.[16] Their cousin was visiting, and their little brother was asleep on the couch. Shanika went into the other room to take a telephone call from her boyfriend. As she was walking into the room, her cousin called that he was going home and would see them all later. Almost instantly, she heard someone yell, "East," and then she heard gunshots. She and her mother met in the hall, and Hargis pushed their mother down and told them to stay down because someone was shooting at the house. Shanika

---

[16] For clarity and brevity, we refer to Ms. Hargis by her first name. No disrespect is intended.

19.

realized she had been shot in the leg. Later, her mother told her Hargis also had been shot.[17]

Harlan Hunter, a licensed investigator and adjunct professor at Bakersfield College, testified as a gang expert. Hunter opined that the East Side Crips are a criminal street gang as defined in California law. Historically, they have been involved in homicides, burglaries, robberies, possession and sales of narcotics, carjackings, drive-by shootings, and other felonies.

After reviewing a number of items in this case, Hunter formed the opinion that on the day of the events in this case, Hargis was not a member of the East Side Crips. He based this opinion on the absence of tattoos on Hargis. Historically, East Side Crip members have tattooed themselves with a number of symbols representing the gang and its various subsets. Hunter also found no photographs or video recordings in which Hargis was depicted with other East Side Crip gang members, flashing gang signs. Hunter likewise found no literature (graffiti or other writing) or paraphernalia tying Hargis to the East Side Crips. In addition, Hunter based his opinion on Ursery's report of his interview of Tryrone Berry. Hunter also considered a report, dated October 29, 2010, that was generated by a detention officer at the jail. In the report, the officer related that he was approached by Hargis, who reported he was under threat from Northerners and Southerners because they wanted to recruit him into their gangs, but he said he did not gang-bang.[18] Finally, Hunter noted that Hargis had a bandanna at the time of the crime.

---

[17] Bakersfield Police Officer Coleman testified in rebuttal that he responded to the shooting call. When he interviewed Shanika, she stated she was asleep and woke to her mother screaming to get on the floor. She said when she sat up in bed, she was shot in the knee. She then lay on the floor until officers arrived. When Coleman asked if she had seen or heard anything, she said no, because she was asleep before the shooting occurred. During the course of his investigation, Coleman did not hear anything about anyone mentioning "East" or "East Side" during the incident.

[18] Hunter usually interpreted the terms "Northerner" and "Southerner" to mean Norteño and Sureño Hispanic gangs. Neither recruits African-Americans into their

20.

It had no relationship to the East Side Crips. In addition, he had a toy gun. Hunter found it highly unusual for a gang like the East Side Crips to plan an event in which one of their members was present with a replica or toy gun. Moreover, Hargis appeared to be totally unprepared for what actually occurred. When the police arrived, he ran and left his coparticipants, thereby not showing the alliance that would be expected from a criminal street gang member.

## DISCUSSION

## I

### SUFFICIENCY OF THE EVIDENCE

Green contends, with Hargis joining, that the evidence was insufficient to support a conviction for attempted robbery.[19] We disagree.

The legal principles are settled. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96

gangs. Hunter surmised that Hargis may have been approached because he had Hispanic features to his appearance.

[19] In our consolidation order, we deemed defendants to have joined in one another's arguments to the extent those arguments are beneficial to them. Although not expressly stated in the order, we also deem the Attorney General's responses to apply to both defendants where such joinder occurs.

21.

Cal.App.3d 353, 367). "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence. [Citations.]" (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.) This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

Defendants were convicted, in count three, of attempted robbery of a clerk at the 7-Eleven. "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) A clerk on duty at a store has constructive possession of the store owner's property for purposes of the robbery statute. (See *People v. Scott* (2009) 45 Cal.4th 743, 746, 754-755.)

"An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a; see § 664 [prescribing punishment for attempt].) Thus, "to be convicted of attempted robbery, the perpetrator must harbor a specific intent to commit robbery and commit a direct but ineffectual act toward the commission of the crime. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

"Other than forming the requisite criminal intent, a defendant need not commit an element of the underlying offense. [Citations.]" (*People v. Medina* (2007) 41 Cal.4th 685, 694.) "'[A] defendant's intent … may be inferred from all of the facts and circumstances disclosed by the evidence. [Citation.]' [Citation.]" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1326.) "The act must go beyond mere preparation, and it must show that the perpetrator is putting his or her plan into action, but the act need not be the last proximate or ultimate step toward commission of the substantive crime. [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 376.) "[T]he line between mere preparation and conduct satisfying the act element of attempt often is difficult to determine; the problem

22.

'is a question of degree and depends upon the facts and circumstances of a particular case.' [Citation.]" (*People v. Watkins* (2012) 55 Cal.4th 999, 1021.) "[T]he act must represent '"some appreciable fragment of the crime."'" [Citations.]" (*Ibid*.)

Defendants say the evidence at best shows preparation to commit some sort of crime, but not necessarily robbery and not necessarily robbery of the 7-Eleven. They say the evidence shows neither a specific intent to rob nor a direct act toward commission of the crime.

The evidence adduced at trial is set out at length, *ante*. From it, jurors reasonably could have concluded defendants were originally in an alley behind the 7-Eleven, where there rarely was any activity so late at night. Green was armed with a loaded firearm; Hargis had an inoperable, but realistic-looking, replica BB gun; and Kristopher Fanning was in possession of a pillowcase that could be used to carry the loot from a robbery. Hargis and Green were wearing hooded sweatshirts and face coverings, and Kristopher Fanning was wearing a ski mask, on a night when it was much too warm for such apparel. Hargis had his face covered as he walked toward the gate in the fence between the 7-Eleven and neighboring delicatessen. He was walking northbound, the direction of the 7-Eleven. The 7-Eleven was open, as the police dispatcher was able to contact the clerk; the delicatessen was closed.

From the foregoing, jurors reasonably could have found defendants intended to rob the 7-Eleven, and that their conduct went beyond mere preparation.[20] Putting on a hooded sweatshirt, tying a bandanna around one's neck, and going to the vicinity of the target may constitute mere preparation. Pulling up the sweatshirt's hood, covering one's

---

[20] In addition to the foregoing, Hargis's jury learned Hargis admitted being part of a plot to rob the 7-Eleven. From his statement, they reasonably could have concluded Kristopher Fanning went back and forth from the rear of the store to the front several times to see how busy it was, and that Geneva Fanning acted as a getaway driver. They did not rob the 7-Eleven because the police came.

23.

face with the bandanna, and approaching the target with a firearm or what appears to be a firearm ready for use in enforcing one's demands (whether through shooting or intimidation) go beyond merely preparatory acts and are sufficient for attempt. (See, e.g., *People v. Anderson* (1934) 1 Cal.2d 687, 689-690; *People v. Vizcarra* (1980) 110 Cal.App.3d 858, 861-863.) This is so despite the fact neither defendant actually entered the store. (See *People v. Dillon* (1983) 34 Cal.3d 441, 456, fn. 4; *United States v. Stallworth* (2d Cir. 1976) 543 F.2d 1038, 1039-1040, 1041.)

## II

### GANG-RELATED ISSUES

### A. Refusal to Sever and Bifurcate

Green contends, with Hargis joining, that the trial court erred and violated due process by refusing to sever the gang-related counts (counts five and seven) and bifurcate the gang-enhancement allegations (counts one through four). We find no abuse of discretion or denial of due process.

1. Background

Hargis moved, in limine, for severance of count seven. He argued the gang evidence was inadmissible with respect to the remaining counts and unduly inflammatory, and that the prosecution was using the gang charge to bolster a weak case against Hargis on the other counts. During the hearing on in limine motions, the court stated it interpreted the request as seeking bifurcation of "the gang *charges* from the substantive offenses." (Italics added.) Counsel for Hargis confirmed that was correct, and counsel for Green joined in the motion. Asked to respond, the prosecutor stated: "Just that gang is alleged as a lesser offense, and it's relevant to motive. And I believe that even if the Court bifurcated it, it would come in anyway."

The court denied the motion, stating: "It does appear to the Court, based on the Indictment that the People have alleged, not only as enhancements, the gang allegations, but in addition a substantive offense involving a gang allegation. And consistent with the

24.

People's theory to prove motive and intent, as just represented by counsel, the Court will find that the probative nature of this information outweighs the prejudicial effect, since it is part and parcel of the People's theory in this case. [¶] Additionally, any substantive offense of gang involvement is charged in this case, there would be cross-admissibility of that information, which would minimize the otherwise prejudicial value and heighten the probative effect of this information."

Counsel for Hargis argued there would be no cross-admissibility on the attempted murder charge. The court responded that its ruling would stand. It explained:

> "[T]he difficulty that the Court would have, and it's not from a practical standpoint, it is recognizing that the Indictment includes an enhancement involving the gang enhancement. In addition to that there are also weapons enhancements as related pursuant to Penal Code Section 12022.53(d) and (e)(1).
>
> "The Court recognizes that, under that particular theory, the jury must reach a determination and evidence will therefore be presented as it relates to gang involvement to make that particular enhancement applicable.
>
> "To the extent that it would be difficult to redact or bifurcate, the Court acknowledges the People's theory in this case. And it is upon the People's theory, as well as the substantive gang enhancement charge in Count 7, that the Court spoke of the cross-admissibility.
>
> "If the Court were to separate it, it would be very confusing to the jury in determining in which manner to receive the evidence, as well as reaching any potential verdicts, especially as to the enhancements alleged regarding the gang enhancements involving weapons specifically."

The gang-related evidence that was admitted at trial is set out in detail in the statement of facts, *ante*. While Ronk was testifying before Green's jury, the trial court instructed jurors:

> "Ladies and gentlemen, as it relates to this witness, Officer Ronk testifying, you may consider the evidence of gang activity only for the limited purpose of deciding the gang-related crimes and enhancements alleged in this case.

25.

"As it relates to statements directly from the defendant to Detective Eddy at the time it was presented, you can consider that for the truth of the matter stated since it was a statement directly from the defendant to Detective Eddy.

"But as it relates to this witness testifying, you can only consider his testimony as it relates to deciding whether the gang-related crimes and enhancements have been proven."

Defendants' juries were separately instructed at the conclusion of evidence. Each was told:

"You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements charged or the defendant had a motive to commit the crimes charged.

"You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion.

"You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."[21]

2.    Analysis[22]

---

[21]    The last word of the oral instruction given Hargis's jury was "crimes."

[22]    We reject the Attorney General's claim of forfeiture based on Green's failure to request severance of count five and defendants' failure to request bifurcation of the enhancement allegations. It is clear, from the trial court's comments, that the court treated the motion as encompassing all gang charges and allegations. Moreover, in light of the court's ruling, any further request for severance or bifurcation would have been futile. (See *People v. Suff* (2014) 58 Cal.4th 1013, 1062, fn. 13; *People v. Abel* (2012) 53 Cal.4th 891, 916.) Because we find no forfeiture, we need not address Green's claim, in which Hargis joins, that if a more specific motion or objection was required, counsel was ineffective for not making it. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 101, fn. 33.)

To the extent defendants argue the trial court's denial of their motion had the legal consequence of violating due process, we further reject the Attorney General's assertion defendants' due process claims were forfeited on appeal by failure to argue them in the trial court. (See *People v. Partida* (2005) 37 Cal.4th 428, 431.)

26.

Technically speaking, substantive counts are severed, while enhancement allegations are bifurcated. (*People v. Burnell* (2005) 132 Cal.App.4th 938, 946, fn. 5.) Turning first to the legal principles applicable to the issue of severance, there is no dispute that the offenses charged in the present case satisfied the statutory requirements for joinder. (§ 954.)[23] "When, as here, the statutory requirements for joinder are met, a defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying the defendant's severance motion. [Citations.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 160-161.) In exercising its discretion, the trial court "weighs 'the potential prejudice of joinder against the state's strong interest in the efficiency of a joint trial. [Citation.]' [Citation.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 37.) In determining whether the trial court abused its discretion, we consider the following factors: "(1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case. [Citation.]" (*People v. Mendoza*, *supra*, 24 Cal.4th at p. 161.) The burden is on the defendant to establish the trial court's ruling exceeded the counts of reason, all of the circumstances being considered. (*People v. Merriman*, *supra*, 60 Cal.4th at p. 37; *People v. Giminez* (1975) 14 Cal.3d 68, 72.)

A determination the evidence was cross-admissible "ordinarily dispels any inference of prejudice. [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 28.)

---

**23**    Section 954 provides, in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission, … under separate counts.… [T]he court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately.…"

"'[T]he issue of cross-admissibility "is not cross-admissibility of the charged offenses but rather the admissibility of relevant evidence" that tends to prove a disputed fact. [Citations.]' [Citation.]" (*People v. Capistrano* (2014) 59 Cal.4th 830, 849.) Moreover, complete (so-called two-way) cross-admissibility is not required. (*Ibid*.) Conversely, "'the absence of cross-admissibility does not, by itself, demonstrate prejudice. [Citation.]' [Citation.]" (*People v. Vines* (2011) 51 Cal.4th 830, 856.) "The state's interest in joinder gives the court broader discretion in ruling on a motion for severance than it has in ruling on admissibility of evidence. [Citation.]" (*People v. Cummings* (1993) 4 Cal.4th 1233, 1284.)

An appellate court evaluates claims a trial court abused its discretion by denying a motion for severance "in light of the showings made and the facts known by the trial court at the time of the court's ruling. [Citations.]" (*People v. Merriman*, *supra*, 60 Cal.4th at pp. 38-39.) Even if the ruling was correct when made, however, reversal will be required if "the joint trial resulted in such gross unfairness as to amount to a due process violation. [Citation.]" (*People v. Capistrano*, *supra*, 59 Cal.4th at p. 853.)

Turning to bifurcation, section 1044 gives a trial court discretion to bifurcate proceedings. (*People v. Calderon* (1994) 9 Cal.4th 69, 74-75.)[24] With respect to whether bifurcation of gang enhancement allegations generally should be ordered, the California Supreme Court has distinguished between a prior conviction allegation, which relates to the defendant's status and may have no connection to the charged offense, and a criminal street gang allegation, which "is attached to the charged offense and is, by definition, inextricably intertwined with that offense." (*People v. Hernandez* (2004) 33

---

[24]     Section 1044 provides: "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."

Cal.4th 1040, 1048 (*Hernandez*).) Because of this difference, less need for bifurcation of a gang enhancement allegation usually exists. (*Ibid*.)

This does not mean bifurcation should never be ordered, however. (*Hernandez*, *supra*, 33 Cal.4th at p. 1049.) "The predicate offenses offered to establish a 'pattern of criminal gang activity' [citation] need not be related to the crime, or even the defendant, and evidence of such offenses may be unduly prejudicial, thus warranting bifurcation. Moreover, some of the other gang evidence, even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt. [¶] In cases *not* involving the gang enhancement, [the Supreme Court has] held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.] But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation — including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like — can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary. [Citation.]" (*Id*. at pp. 1049-1050.)

The court went on to say that "[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself — for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged — a court may still deny bifurcation." (*Hernandez*, *supra*, 33 Cal.4th at p. 1050.) The court analogized the issue to the severance of charged offenses, in which judicial economy is a factor to be considered. (*Ibid*.) "'When the offenses are joined for trial the defendant's guilt of all the offenses is at issue and the problem of confusing the jury with collateral matters does not arise. The

29.

other-crimes evidence does not relate to [an] offense for which the defendant may have escaped punishment. That the evidence would otherwise be inadmissible may be considered as a factor suggesting possible prejudice, but countervailing considerations that are not present when evidence of uncharged offenses is offered must be weighed in ruling on a severance motion. The burden is on the defendant therefore to persuade the court that these countervailing considerations are outweighed by a substantial danger of undue prejudice.' [Citation.]" (*Ibid.*) The court recognized that "[t]he analogy between bifurcation and severance is not perfect" (*ibid.*), but concluded that "the trial court's discretion to deny bifurcation of a charged gang enhancement is … broader than its discretion to admit gang evidence when the gang enhancement is not charged. [Citation.]" (*Ibid.*)

In the present case, there was no evidence of intergang rivalry or retaliation, as is often seen in cases in which evidence of gang membership is relevant to motive. (See, e.g., *People v. McKinnon* (2011) 52 Cal.4th 610, 654-655; *People v. Carter* (2003) 30 Cal.4th 1166, 1194-1195.) Nevertheless, and contrary to Green's assertions, at least some of the gang evidence was relevant to show Green's motive for shooting a police officer. Moreover, the evidence was relevant to whether the attempted murder was a natural and probable consequence of robbery, as far as Hargis was concerned, and whether defendants were guilty of the charged conspiracy. This being the case, the evidence would have been admissible even if the gang charges and enhancement allegations had been tried separately. (See, e.g., *People v. Montes* (2014) 58 Cal.4th 809, 859; *People v. McKinnon*, *supra*, 52 Cal.4th at p. 655; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1129, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Carter*, *supra*, 30 Cal.4th at p. 1194; *People v. Burnell*, *supra*, 132 Cal.App.4th at p. 947; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550; *People v. Funes* (1994) 23 Cal.App.4th 1506, 1518; *People v. Superior Court* (*Quinteros*)

(1993) 13 Cal.App.4th 12, 20-21; but see *People v. Memory* (2010) 182 Cal.App.4th 835, 851-852, 858-859.)

Evidence of gang membership has a "highly inflammatory impact" (*People v. Cox* (1991) 53 Cal.3d 618, 660, disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22) and "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged" (*People v. Carter*, *supra*, 30 Cal.4th at p. 1194). The same is true of gang-related evidence, particularly regarding criminal activities. (*People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345.) Here, however, the gang evidence was no more inflammatory than the evidence related to the other charged offenses, no evidence of uncharged criminal activity by defendants was admitted, and only the minimum number of predicate offenses — which were not unduly inflammatory — were presented. Significantly, both juries were instructed they could not infer criminal disposition from the gang evidence. Moreover, in light of the positive eyewitness identifications of defendants by police officers who responded to the vicinity of the 7-Eleven, this is not a situation in which strong evidence of gang affiliation and activities was coupled with a weak case on the nongang offenses.[25]

In light of the foregoing, the trial court did not abuse its discretion by refusing to sever the gang charges and/or bifurcate the gang enhancement allegations. (See *People v. Mendoza*, *supra*, 24 Cal.4th at pp. 161-162; *People v. Burnell*, *supra*, 132 Cal.App.4th at pp. 947-948.) For the same reasons, the trial court's denial of severance and/or bifurcation did not result in a violation of due process.

---

[25] This was not, of course, a capital case.

**B.** **Testimony Admitted Before Hargis's Jury Only**

Hargis contends the trial court erred by admitting certain gang evidence, which he says was inflammatory and of minimal relevance, before his jury. We conclude any error was harmless.

1. Background

The prosecutor began his examination of Ronk, the People's gang expert, by eliciting Ronk's training and experience in the field of gang recognition and suppression. During the course of that portion of Ronk's testimony, the following occurred:

"Q Could you give us an idea of sort of what percentage of that experience is — I don't want to say devoted to but encompasses work with East Side Crip gang members?

"A Of the recent past, probably the last year, I'd say the majority of my job has been focused on the East Side Crips because they've been the most active, and they are definitely, if not the most violent, they are one of the most violent gangs in Bakersfield. And with all the recent shootings that we've had and the investigations of those —

"[DEFENSE COUNSEL]: Your Honor, I will object to that. That is beyond the scope and nonresponsive.

"THE COURT: Sustained at this point as nonresponsive.

"Q (By [the prosecutor]) Can you tell us —

"THE COURT: The answer will stand.

"[DEFENSE COUNSEL]: Ask that it be stricken.

"THE COURT: It will stand.

"Q (By [the prosecutor]) Can you tell us what recent experiences you've had with the East Side Crips?

"A I've had several experiences. There's shooting investigations. I know a person that I've contacted several times, Kevin McMahan. He was recently shot and killed on the freeway. He was in the company of Andrew Ward, who I have also met on several occasions. He got shot, but he lived. That was actually right before we started jury selection here.

32.

"Prior to that, say, February, early March, I had an incident involving three East Side Crips that kind of scared me because I never had anything like that happen before. Robert Ellis —

"[DEFENSE COUNSEL]: May I take this witness on voir dire as to whether or not this is part of his opinion?

"THE COURT: You can reserve for cross-examination. [¶] … [¶]

"THE WITNESS: Robert Ellis had admitted membership to the East Side Crips to me on a prior occasion. I knew Robert Ellis at this point — particular point in time, he was on parole, and he was absconding from his parole, and so he had a felony warrant for his arrest.

"Me and my partner were driving in East Side Crip territory, and I observed Robert Ellis in the company of Tyrobe Lindsey and Brandon Johnson, both subjects I have contacted on numerous occasions. They have admitted to me membership in the East Side Crips. Brandon Johnson is a very good friend of Kevin McMahan, who I said earlier had been shot and killed.

"Now, when we saw Robert Ellis, he was in the street, and so I pulled up next to him, and I tried to get him to stop, which he started going towards the house. Long story short, due to actions that he was doing, I thought that he had a firearm, and while trying to take him into custody, I had to go hands on him because he tried to get in the car and take off. So I wrapped him up.

"At that point Tyrobe Lindsey and Brandon Johnson actually advanced on our position and basically physically —

"[DEFENSE COUNSEL]: I am going to object, Your Honor. It is a narrative. It is beyond the scope. 352.

"THE COURT: Sustained as to narrative.

"Q (By [the prosecutor]) Could you tell us more about the experiences that you've had with the East Side Crips. You can pick up where you left off.

"A So Tyrobe Linds[e]y and Brandon Johnson advanced on our position, basically put their hands up.

"[DEFENSE COUNSEL]: And it would be a 352 objection, Your Honor.

33.

"THE COURT:  Overruled.

"THE WITNESS:  Said that they were going to cause physical harm to us.  Basically without cussing at you guys, they said a lot of things about beating us up.

"At that point a large crowd had gathered, and it was the only — it was the first time and the only time that I have ever expedited units on the radio, got on the radio and asked for help, pretty much.  That is the only time that that's ever happened, and it was directly related to their membership within the gang.  Normal people are not going to do that.  That was a situation in which —

"[DEFENSE COUNSEL]:  Your Honor, I object to that ….  It's mind reading, and it's speculation, and it is in violation of the ruling in *People vs. Killebrew*.[26]

"THE COURT:  Overruled on that ground.  [¶]  Officer.

"THE WITNESS:  That was an account of what recently happened."

Later, when Ronk was giving his opinion concerning whether Hargis was an active member of a criminal street gang, the court told jurors:  "Ladies and gentlemen, maybe this is a good time for me to admonish you that the testimony by Officer Ronk at this time involving evidence of gang-related activity can only be considered by you for the limited purpose of deciding the gang-related crimes and enhancements in this case. You cannot consider it for any other purpose except for what I've just stated."  As previously set out, jurors subsequently were instructed they could consider evidence of gang activity only for the limited purpose of deciding whether Hargis acted with the intent, purpose, and knowledge required to prove the charged gang-related crimes and enhancements, or had a motive to commit the charged crimes; in evaluating witness credibility; and in considering the information relied on by an expert witness in reaching

---

**26**     *People v. Killebrew* (2002) 103 Cal.App.4th 644.  *Killebrew* was disapproved on various points in *People v. Vang* (2011) 52 Cal.4th 1038.

34.

his or her opinion. Jurors expressly were told they could not conclude from the evidence that Hargis was a person of bad character or had a criminal disposition.

2.   Analysis

Hargis contends the court erred by refusing to strike Ronk's perception of the violent nature of the East Side Crips, because the testimony constituted inadmissible character evidence under Evidence Code section 1101.[27]  He further says that testimony and Ronk's description of his recent violent confrontation — which was unrelated to defendants — were highly inflammatory and only minimally probative, and so should have been excluded pursuant to Evidence Code section 352.[28]  Hargis says admission of the evidence constituted an abuse of discretion and violated his right to due process.[29]

The only objections Hargis raised to Ronk's testimony about the violent nature of the East Side Crips were "beyond the scope" and "nonresponsive."  Accordingly, he has

---

[27]   Subject to exceptions not at issue here, subdivision (a) of Evidence Code section 1101 provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

[28]   Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[29]   In his discussion of the standard of review, Hargis notes that a criminal defendant has a constitutional right to present all relative evidence of significant probative value in his favor, notwithstanding Evidence Code section 352, and so, he says, close scrutiny must be given to rulings that impinge upon this right by erroneously either admitting or excluding evidence to a defendant's detriment.  We are not sure what point Hargis is trying to make, since his complaint does not concern the trial court's exclusion of evidence proffered by the defense.  (See, e.g., *Crane v. Kentucky* (1986) 476 U.S. 683, 690; *People v. Cunningham* (2001) 25 Cal.4th 926, 998-999.)  We assume Hargis is referring to the fact that, as the California Supreme Court has stated, a defendant's Sixth Amendment right to present a defense "includes the right not to have the trial court interfere with a defendant's ability to receive a fair trial." (*People v. Ramos* (2004) 34 Cal.4th 494, 528.)

forfeited his claims of error under Evidence Code sections 352 and 1101 as to that specific testimony. (E.g., *People v. Jones* (2013) 57 Cal.4th 899, 951 [Evid. Code, § 1101]; *People v. Edwards* (2013) 57 Cal.4th 658, 709 [Evid. Code, § 352]; *People v. Valdez* (2012) 55 Cal.4th 82, 130 [Evid. Code, § 1101], 138-139 [Evid. Code, § 352]; *People v. Thornton* (2007) 41 Cal.4th 391, 430, fn. 6 [Evid. Code, § 1101].)**30** We recognize Ronk testified at an Evidence Code section 402 hearing held to establish his qualifications as an expert and whether his opinions had a sufficient basis. At the conclusion of the hearing, counsel for Green objected to the gang evidence in general under Evidence Code section 352, while counsel for Hargis argued — without citing any statutory basis — the gang evidence was "tenuous" and the expert had not presented enough to put in front of the jury. The court undertook a balancing of probative value versus prejudicial effect, and ruled the People could present Ronk's testimony to the jury. Such generalized objections following a foundational hearing are insufficient to preserve claims of error with respect to specific pieces of testimony, particularly when that testimony was not given at said hearing. (See *People v. Rundle* (2008) 43 Cal.4th 76, 116, disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22; *People v. Demetrulias* (2006) 39 Cal.4th 1, 22.)

In any event, assuming the trial court erred in admitting the challenged portions of Ronk's testimony, the error was harmless. "'[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence .…'" (*People v. Jablonski* (2006) 37 Cal.4th 774, 824.) "Abuse may be found if the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner, but reversal of the ensuing judgment is appropriate only if the error has resulted in a manifest miscarriage of justice. [Citations.]" (*People v. Coddington* (2000) 23

---

**30** It is unclear why the trial court declined to strike the response it agreed was nonresponsive. Evidence Code section 766 requires that "answers that are not responsive shall be stricken on motion of any party."

Cal.4th 529, 587-588, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) In other words, we apply the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, under which the erroneous admission of evidence constitutes reversible error "only if a reasonable probability exists that the jury would have reached a different result had this evidence been excluded. [Citations.]" (*People v. Whitson* (1998) 17 Cal.4th 229, 251; see, e.g., *People v. Guerra* (2006) 37 Cal.4th 1067, 1116 [erroneous limitation of defense cross-examination of witness]; *People v. Marks* (2003) 31 Cal.4th 197, 226-227 [error under Evid. Code, § 352]; *People v. Prieto* (2003) 30 Cal.4th 226, 247 [erroneous admission of expert testimony]; *People v. Cudjo* (1993) 6 Cal.4th 585, 611-612 [erroneous exclusion of defense third-party-culpability evidence]; *People v. Malone* (1988) 47 Cal.3d 1, 22 [error in admitting other-crimes evidence]; *People v. Davis* (1963) 217 Cal.App.2d 595, 599 [erroneous failure to strike unresponsive answer].)

We see no reasonable probability Hargis's jury would have reached a different result had Ronk not been permitted to testify concerning his perception of the relative violence of the East Side Crips in general, or his recent encounter with certain members thereof. The gang evidence as a whole was properly admitted and not unduly inflammatory. The prosecutor did not mention the challenged portions of Ronk's testimony in his arguments to the jury. As previously mentioned, jurors were given instructions limiting their use of the evidence. We presume they followed these instructions. (*People v. Waidla* (2000) 22 Cal.4th 690, 725; *People v. Archer* (1989) 215 Cal.App.3d 197, 204.)

We reject Hargis's claim admission of the evidence had the effect of violating his right to due process. (See *People v. Partida*, *supra*, 37 Cal.4th at p. 431.) In light of the rest of the evidence (gang and nongang) and the limiting instructions, it simply did not render his trial fundamentally unfair. (Compare *People v. Williams* (2009) 170

37.

Cal.App.4th 587, 612-613 with *People v. Albarran* (2007) 149 Cal.App.4th 214, 227-232; see *Windham v. Merkle* (9th Cir. 1998) 163 F.3d 1092, 1103.)

**III**

**S**ENTENCING **I**SSUES

**A.**    **Failure to Stay Sentence on Count Three**

As previously described, defendants were convicted in count three of attempted robbery. As to Hargis, the trial court imposed (following the recall of sentence) the lower term of 16 months, plus a five-year enhancement pursuant to section 186.22, subdivision (b)(1), which it stayed pursuant to California Rules of Court, rule 4.447, plus an enhancement of 25 years to life pursuant to section 12022.53, subdivisions (d) and (e)(1). As to Green, the court imposed the upper term of three years, plus a five-year enhancement pursuant to section 186.22, subdivision (b)(1), plus an enhancement of 25 years to life pursuant to section 12022.53, subdivision (d). As to each defendant, the court ordered that the term imposed on count three be served consecutively to that imposed on count one, because it found the crimes and their objectives were predominantly independent of each other.

Defendants now contend the sentence on count three should have been stayed pursuant to section 654.[31] We disagree.

Section 654, subdivision (a) provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." This statute "prohibits punishment for two crimes arising from a single, indivisible course of conduct. [Citation.]" (*People v. Islas* (2012) 210 Cal.App.4th 116, 129, citing *People v. Latimer*

---

[31]    Neither defendant raised this issue in the trial court. However, an objection is not required to preserve a section 654 claim for review on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 354 & fn. 17.)

(1993) 5 Cal.4th 1203, 1208.) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor" (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 334), not the temporal proximity of his or her offenses (*People v. Capistrano*, *supra*, 59 Cal.4th at p. 886).

"Where a defendant entertains multiple criminal objectives independent of and not merely incidental to each other, he may be punished for more than one crime even though the violations share common acts or are parts of an otherwise indivisible course of conduct. [Citation.]" (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.) Whether a defendant harbored a separate intent and objective for each offense is a factual determination for the trial court, and its conclusion will be sustained on appeal if supported by any substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730.) On review of this issue, we consider the evidence in the light most favorable to the judgment. (*People v. Williamson* (1979) 90 Cal.App.3d 164, 172.)

In addition, even if a defendant "entertained but a single principal objective during an indivisible course of conduct, he may nevertheless be punished for multiple convictions if during the course of that conduct he committed crimes of violence against different victims. [Citations.] As the purpose of section 654 'is to insure that defendant's punishment will be commensurate with his criminal liability,' when he 'commits an act of violence with the intent to harm more than one person or by means likely to cause harm to several persons,' his greater culpability precludes application of section 654. [Citation.]" (*People v. Miller* (1977) 18 Cal.3d 873, 885, overruled on another ground in as stated in *People v. Oates* (2004) 32 Cal.4th 1048, 1067-1068, fn. 8.)

We first examine the trial court's imposition of a consecutive sentence on count three as to Green. Green says the shooting of Aleman was indivisible from the attempted robbery, and so the crimes cannot be separately punished, because the shooting "was a

natural and essential part of the attempted robbery, the avenue towards completion of the robbery, and not a separate plan with a separate objective." The Attorney General disagrees, and argues separate punishment was proper because the two crimes involved not only a motive of robbery, but also the separate goal of attaining respect within the East Side Crips criminal street gang by committing the ultimate gang offense, killing a police officer. The Attorney General also claims the multiple victim exception to section 654 applies.

We conclude the trial court properly imposed separate punishments on Green for the two convictions. A reasonable inference from the record is that Green and his companions initially planned only to rob the clerk, and perhaps customers, of the 7-Eleven. When the police arrived, however, Green came up with a new idea: shooting Aleman instead of surrendering, thereby committing an act that would garner him a great deal of respect within his gang. Thus, substantial evidence supports the conclusion that when Green committed the offenses, he harbored multiple criminal objectives that were independent of, and not merely incidental to, each other. (*People v. Blake*, *supra*, 68 Cal.App.4th at p. 512; see, e.g., *People v. Coleman* (1989) 48 Cal.3d 112, 162-163; *People v. Cleveland* (2001) 87 Cal.App.4th 263, 266-267, 271-272; *People v. Sandoval* (1994) 30 Cal.App.4th 1288, 1295-1296, 1299-1300; *People v. Porter* (1987) 194 Cal.App.3d 34, 37-39.) Separate punishments thus were proper even assuming the attempted robbery was not yet complete when Aleman was shot. (See *People v. Young* (1992) 11 Cal.App.4th 1299, 1311-1312.)[32]

---

[32] We reject Green's argument the People cannot claim, on appeal, that the attempted robbery and attempted murder were separate and divisible, when they argued in the trial court that the shooting was a natural and probable consequence of the attempted robbery. Although Green's jury was instructed on the natural and probable consequences theory with respect to attempted murder, this was done in case jurors had a doubt whether Green or Kristopher Fanning shot Aleman. In his argument to the jury, the prosecutor relied almost exclusively on the theory Green was the actual shooter. By finding Green personally and intentionally discharged a firearm, causing great bodily injury, within the

In addition, we disagree with Green's assertion the attempted robbery was not a crime of violence for purposes of applying the multiple victim exception to section 654. "'[W]hether a crime constitutes an act of violence that qualifies for the multiple-victim exception to section 654 depends upon whether the crime … is defined to proscribe an act of violence against the person.'" (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1023.) Premeditated attempted murder clearly qualifies. (*People v. Oates*, *supra*, 32 Cal.4th at p. 1063.) Pointing to section 667.5, subdivision (c), Green says attempted robbery does not. It is true that a completed robbery, but not an attempted one, is statutorily defined as a violent felony. (§ 667.5, subd. (c)(9).) For purposes of section 654, however, courts have found acts or crimes of violence without reference to section 667.5, subdivision (c). (See, e.g., *People v. McFarland* (1989) 47 Cal.3d 798, 803; *People v. Miller*, *supra*, 18 Cal.3d at p. 886; *People v. Solis*, *supra*, 90 Cal.App.4th at pp. 1023-1024; *People v. Centers* (1999) 73 Cal.App.4th 84, 99-100.) In any event, section 667.5, subdivision (c)(22) defines as a "'violent felony'" "[a]ny violation of Section 12022.53." Green's jury found true an enhancement under subdivision (d) of section 12022.53 with respect to the attempted robbery as well as the attempted murder.

Hargis's case stands in a somewhat different posture, because his jury was *only* presented with a natural-and-probable-consequence theory of liability (albeit based on aiding and abetting and conspiracy) on the attempted murder count. Although jurors were instructed on the requirements for directly perpetrating attempted murder, the prosecutor made it clear Hargis could only be convicted of that charge and count two (assault with a semiautomatic firearm on a peace officer) under the natural and probable consequences theory. Although whether a defendant harbored multiple intents and objectives is a factual one for the trial court, that court "cannot countermand the jury and

meaning of section 12022.53, subdivision (d), jurors necessarily found he was indeed the actual shooter. Under the circumstances, the People are not precluded from arguing divisibility on appeal.

41.

make the contrary finding [defendant] in fact … had both objectives." (*People v. Bradley* (2003) 111 Cal.App.4th 765, 770 (*Bradley*); compare *People v. McKinzie* (2012) 54 Cal.4th 1302, 1368-1369, disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3 with *People v. Jones* (2012) 54 Cal.4th 350, 359.)

In *Bradley*, the defendant acted as the "'bait'" in a scheme to lure a prosperous-looking customer into leaving a casino so her two male accomplices could rob him. All went according to plan until one of the men beat the victim with a firearm and then shot him multiple times. The victim survived. The defendant was convicted of attempted murder and second degree robbery, for which the trial court imposed consecutive sentences. (*Bradley*, *supra*, 111 Cal.App.4th at pp. 767-768.)

On appeal, the defendant challenged the imposition of consecutive sentences. (*Bradley*, *supra*, 111 Cal.App.4th at p. 768.) The Court of Appeal observed: "Appellant had only one objective and one intent — to aid and abet a robbery of the victim .… She was neither tried for nor convicted of the attempted murder charge on the theory she intended the commission of that crime. Rather she was convicted on a theory this second offense was a 'natural and probable' consequence of the offense she did intend, that is, the robbery." (*Id*. at pp. 768-769.) Under the cirumstances, the court reasoned, "without a finding appellant at some point entertained as an independent objective the goal of attempting to murder [the victim], … section 654 denies the trial court discretion to impose consecutive sentences on appellant for the robbery and attempted murder convictions. [¶] … [¶] Appellant is clearly less culpable than her male confederate who shot [the victim] or the other male confederate who aided and abetted that second crime. Unlike them, she only had a single criminal objective — the robbery .… Indeed she was unaware that second crime was occurring until after it was completed and thus didn't have an opportunity to prevent or even protest its commission. As a result, there simply was no evidence appellant exhibited the more dangerous mental state warranting a consecutive sentence under … section 654." (*Id*. at pp. 770-771.)

The court distinguished the case of *People v. Nguyen* (1988) 204 Cal.App.3d 181 (*Nguyen*). In that case, the defendant and an accomplice, both of whom were armed, entered a market. The confederate escorted the clerk to a rear room and took money from his pockets. The defendant remained up front and opened the cash register. The victim heard the defendant shout "a Vietnamese battle phrase used when 'someone was to kill or be killed.'" (*Id*. at p. 185.) The confederate then kicked the clerk in the ribs and shot him in the back. (*Ibid*.)

On appeal, the defendant claimed the trial court violated section 654 by imposing consecutive sentences for the attempted murder and the robbery. (*Nguyen*, *supra*, 204 Cal.App.3d at p. 189.) Despite the fact the jury found the shooting to have been a natural and probable consequence of the robbery (*id*. at p. 190), the Court of Appeal disagreed, explaining: "[A] separate act of violence against an unresisting victim or witness, whether gratuitous or to facilitate escape or to avoid prosecution, may be found not incidental to robbery for purposes of section 654. If the trier of fact determines the crimes have different intents and motives, multiple punishments are appropriate." (*Id*. at p. 193.)

The *Bradley* court distinguished *Nguyen* in part on the basis that there, unlike in *Bradley*, "the aider and abettor of the robbery actively encouraged the shooter to kill the victim.… [¶] As a result, applying the rationale of our opinion to Nguyen, he would still be subject to consecutive sentencing. Ample evidence in the record of that case would support a finding Nguyen shared his cohort's independent objective of attacking the victim. Indeed he evidently was the instigator of that attack. This contrasts sharply with appellant's role — or actually nonrole — in her cohort's shooting of the victim here. Not only did she not encourage the attack, she was oblivious this deviation from the original plan was taking place until the shots rang out and the attempted murder was completed. [¶] Obviously, Nguyen personally entertained both objectives his principal had — to rob the store and to attack the victim. In the case before this court, it is equally obvious

appellant only had a single objective — to rob the victim." (*Bradley*, *supra*, 111 Cal.App.4th at pp. 771-772, fns. omitted.)

In the present case, the Attorney General attempts to distinguish *Bradley*, and bring Hargis's situation within the reasoning of *Nguyen*, by arguing both defendants simultaneously harbored the dual motives of attempting to rob the 7-Eleven and committing crimes to gain acceptance and status within the gang. She then says the fact Hargis gained an elevation in gang status from associate to full member shows he "benefitted fully from the dual motive to both rob the store *and shoot the police officer*." (Italics added.) Assuming the evidence supports the notion Hargis harbored a motive of committing crimes to gain acceptance and status within the gang, however, it does not support the notion he had any motive or intent to shoot a police officer.

Were the victim of the attempted robbery and the victim of the attempted murder the same in the present case, we would find *Bradley* controlling. As the Attorney General further argues, however, the multiple victim exception to section 654 applies in the present case. Although Hargis may not have specifically intended a police officer would be shot, the jury found he was a principal in commission of an offense in which another principal personally and intentionally discharged a firearm, causing great bodily injury. (§ 12022.53, subds. (d) & (e)(1).) Hargis admitted knowing, before arriving in the vicinity of the store, that Green was armed with a firearm. Regardless of the theory of liability, Hargis — like Green — was a principal in the commission of crimes of violence against different victims. (See *People v. Miller*, *supra*, 18 Cal.3d at p. 885.) Accordingly, he was properly punished for both count one and count three.

## B.    <u>Cruel and Unusual Punishment</u>

Defendants contend their sentences violate the Eighth Amendment to the United States Constitution, because they amount to terms of life in prison without the possibility

44.

of parole (LWOP) for nonhomicide offenses, and defendants were juveniles at the time of the crimes. We conclude section 3051 removes any constitutional infirmity.[33]

1.      Background

Hargis's date of birth is October 27, 1992, making him 16 years old at the time of the offenses. Originally, he was sentenced to a total determinate term of two years, with a consecutive indeterminate term of 57 years to life. He subsequently moved to have his sentence recalled on the grounds the trial court did not have before it his statement in mitigation, and imposed a sentence that violated the Eighth Amendment because it was in effect a sentence of LWOP. The trial court granted the motion for recall. After argument, the court observed it had not found any case in which a sentence of approximately 60 years to life for a juvenile had been held unconstitutional. It determined that if Hargis were sentenced to 57 years to life in prison, he would be eligible for parole at about age 67, and so would have a substantial life expectancy after his release. The court did find circumstances in mitigation with respect to count three, however, and so lowered the sentence imposed on that count. As to count one, the court imposed a total unstayed term of 32 years to life, comprised of seven years to life for the offense plus 25 years to life for the section 12022.53 enhancement. As to count three, the court imposed an unstayed term of 16 months for the offense plus 25 years to life for the section 12022.53 enhancement. Sentence on the remaining counts was imposed but stayed pursuant to section 654. Hargis's total unstayed sentence thus was a determinate term of 16 months, with a consecutive indeterminate term of 57 years to life.

---

**33**      The issues addressed in this portion of our opinion are on review before the California Supreme Court in a number of cases, including *In re Alatriste* (2013) 220 Cal.App.4th 1232, review granted February 19, 2014, S214652, its companion case *In re Bonilla*, review granted February 19, 2014, S214960, and *People v. Franklin* (2014) 224 Cal.App.4th 296, review granted June 11, 2014, S217699.

Green's date of birth is October 29, 1991, making him 17 years old at the time of the offenses. At his sentencing hearing, he objected to imposition of a term that, he contended, would constitute LWOP. The court rejected the argument, finding a reasonable likelihood Green someday would be paroled. As to count one, the court imposed a total term of 40 years to life, comprised of 15 years to life for the offense plus 25 years to life for the section 12022.53 enhancement. As to count three, the court imposed a determinate term of eight years, comprised of three years for the offense, plus five years for the section 186.22 enhancement, plus 25 years to life for the section 12022.53 enhancement. Sentence on the remaining counts was imposed but stayed pursuant to section 654. Green's total unstayed sentence thus was a determinate term of eight years, with a consecutive indeterminate term of 65 years to life.

2.      Analysis

"The Eighth Amendment to the United States Constitution applies to the states. [Citation.] It prohibits the infliction of 'cruel *and* unusual' punishment. [Citation.] Article I, section 17 of the California Constitution prohibits infliction of '[c]ruel *or* unusual' punishment.… The distinction in wording is 'purposeful and substantive rather than merely semantic. [Citations.]' [Citation.] As a result, we construe the state constitutional provision 'separately from its counterpart in the federal Constitution. [Citation.]' [Citation.] This does not make a difference from an analytic perspective, however [citation] …. The touchstone in each [provision] is gross disproportionality. [Citations.] Whether a punishment is cruel and/or unusual is a question of law subject to our independent review, but underlying disputed facts must be viewed in the light most favorable to the judgment. [Citations.]" (*People v. Palafox* (2014) 231 Cal.App.4th 68, 82-83.)

The United States Supreme Court "has adopted categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty. [Citation.]" (*Miller v. Alabama* (2012) 567 U.S. ___, ___ [132

S.Ct. 2455, 2463] (*Miller*).)  In *Miller*, the high court outlawed, as violative of the Eighth Amendment, mandatory LWOP for juveniles convicted of murder.  (*Miller*, *supra*, at p. ___ [132 S.Ct. at p. 2469].)  The court explained:  "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment."  (*Ibid.*)

In *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), the high court banned imposition of outright LWOP sentences for juveniles convicted of nonhomicide offenses. (*Id*. at pp. 52-53, 74-75.)  The court stated:

> "A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime.  What the State must do, however, is give [juvenile] defendants … some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.  It is for the State, in the first instance, to explore the means and mechanisms for compliance.  It bears emphasis, however, that while the Eighth Amendment forbids a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life.  Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives.  The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life.  It does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society."  (*Graham*, *supra*, 560 U.S. at p. 75.)

In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), the California Supreme Court held that the proscription in *Graham* against LWOP for nonhomicide offenses applies equally to sentences that are the functional equivalent of LWOP.  (*Caballero*, *supra*, at pp. 265, 268.)[34]  The court stated:

> "[S]entencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's

---

[34]    In *Caballero*, the 16-year-old defendant was convicted of three counts of attempted murder with various enhancements, and sentenced to a total of 110 years to life.  (*Caballero*, *supra*, 55 Cal.4th at p. 265.)

natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment. Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future. Under *Graham*'s nonhomicide ruling, the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.' [Citation.]" (*Caballero*, *supra*, 55 Cal.4th at pp. 268-269.)

Hargis was 20 years old at the time of his sentencing. He was awarded credit (actual plus conduct) for 1,708 days in custody. The credit equates to over four and one-half years. Thus, he would be incarcerated for slightly less than 54 years after sentencing, calculated by deducting the 1,708 days of credit from his aggregate term of 58 years 4 months to life, and (leaving aside § 3051) would be eligible for parole at around 74 years of age.[35]

Green was 21 years old at the time of his sentencing. He was awarded credit (actual plus conduct) for 1,532 days in custody.[36] The credit equates to slightly over four years. Thus, he would be incarcerated for slightly less than 69 years after sentencing,

---

[35] We are not sure on what the trial court based its determination as to when Hargis would become parole eligible. In light of our conclusion concerning section 3051, *post*, any errors in our computations concerning defendants' parole eligibility dates are immaterial.

[36] There was some question at sentencing about when Green was transferred from juvenile hall to jail, which could have increased his conduct credits. The probation officer offered to recalculate the credits; upon receiving an update, the court was going to issue a minute order with the new amount, which then would be included on the abstract of judgment. The abstract of judgment contained in the record on appeal reflects the credits stated above. Accordingly, we assume they were determined to have been correctly calculated.

calculated by deducting the 1,532 days of credit from his aggregate term of 73 years to life, and (leaving aside § 3051) would be eligible for parole at around 90 years of age.

At Green's request, we have taken judicial notice of the United States Department of Health and Human Services Centers for Disease Control and Prevention's National Vital Statistics Reports, volume 61, issue 4, which was issued May 8, 2013. That report shows the life expectancy at birth of a person in the United States in the year 2010 (the most recent year for which such statistics appear to be available) was 78.7 years.[37] According to the Social Security Administration's Actuarial Life Table,[38] the life expectancy in 2011 for each defendant was slightly under 77 years. Under either figure, Green, at least, could be expected to die before becoming parole eligible.

Although "[h]ow *much* life expectancy must remain at the time of eligibility for parole" has not yet been determined (*People v. Perez* (2013) 214 Cal.App.4th 49, 57), it is apparent that Green's sentence, at least, is the functional equivalent of LWOP (see, e.g., *People v. Lewis* (2013) 222 Cal.App.4th 108, 119; *People v. Thomas* (2012) 211 Cal.App.4th 987, 1014-1016; *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482; *People v. Mendez* (2010) 188 Cal.App.4th 47, 62-63; but see *People v. Perez*, *supra*, 214 Cal.App.4th at p. 58), and Hargis's sentence may be. In each instance, however, the sentence is saved from unconstitutionality by section 3051, which became effective after defendants were sentenced. Stripped of all nonessentials, subdivision (b)(3) of that statute makes both defendants eligible for parole in their 25th year of incarceration.[39]

[37]    Available at <http://www.cdc.gov/nchs/data/nvsr/nvsr61/nvsr61_04.pdf> (as of Aug. 24, 2015).

[38]    Available at <http://www.socialsecurity.gov/OACT/STATS/table4c6.html> (as of Aug. 24, 2015).

[39]    Section 3051, which was added by Statutes 2013, chapter 312, section 4 provides: "(a)(1) A youth offender parole hearing is a hearing by the Board of Parole Hearings for the purpose of reviewing the parole suitability of any prisoner who was under 18 years of age at the time of his or her controlling offense. [¶] (2) For the purposes of this section, the following definitions shall apply: [¶] (A) 'Incarceration' means detention in a city or

49.

county jail, a local juvenile facility, a mental health facility, a Division of Juvenile Justice facility, or a Department of Corrections and Rehabilitation facility.  [¶]  (B) 'Controlling offense' means the offense or enhancement for which any sentencing court imposed the longest term of imprisonment.  [¶]  (b)(1) A person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is a determinate sentence shall be eligible for release on parole at a youth offender parole hearing by the board during his or her 15th year of incarceration, unless previously released pursuant to other statutory provisions.  [¶]  (2) A person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is a life term of less than 25 years to life shall be eligible for release on parole by the board during his or her 20th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration pursuant to other statutory provisions.  [¶]  (3) A person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions.  [¶]  (c) An individual subject to this section shall meet with the board pursuant to subdivision (a) of Section 3041.  [¶] (d) The board shall conduct a youth offender parole hearing to consider release.  At the youth offender parole hearing, the board shall release the individual on parole as provided in Section 3041, except that the board shall act in accordance with subdivision (c) of Section 4801.  [¶]  (e) The youth offender parole hearing to consider release shall provide for a meaningful opportunity to obtain release.  The board shall review and, as necessary, revise existing regulations and adopt new regulations regarding determinations of suitability made pursuant to this section, subdivision (c) of Section 4801, and other related topics, consistent with relevant case law, in order to provide that meaningful opportunity for release.  [¶]  (f)(1) In assessing growth and maturity, psychological evaluations and risk assessment instruments, if used by the board, shall be administered by licensed psychologists employed by the board and shall take into consideration the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual.  [¶] (2) Family members, friends, school personnel, faith leaders, and representatives from community-based organizations with knowledge about the individual before the crime or his or her growth and maturity since the time of the crime may submit statements for review by the board.  [¶]  (3) Nothing in this section is intended to alter the rights of victims at parole hearings.  [¶]  (g) If parole is not granted, the board shall set the time for a subsequent youth offender parole hearing in accordance with paragraph (3) of subdivision (b) of Section 3041.5.  In exercising its discretion pursuant to paragraph (4) of subdivision (b) and subdivision (d) of Section 3041.5, the board shall consider the factors in subdivision (c) of Section 4801.  No subsequent youth offender parole hearing shall be necessary if the offender is released pursuant to other statutory provisions prior

This being the case, they no longer are subject to de facto LWOP sentences, because each is clearly provided with a meaningful opportunity to obtain release within his expected lifetime.

In *Graham*, the United States Supreme Court determined "[i]t [was] for the State, in the first instance, to explore the means and mechanisms for compliance" with the requirement that juvenile nonhomicide offenders be given "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (*Graham*, *supra*, 560 U.S. at p. 75.) The California Supreme Court followed in *Caballero* by urging the Legislature "to enact legislation establishing a parole eligibility mechanism that provides a defendant serving a de facto life sentence without possibility of parole for nonhomicide crimes that he or she committed as a juvenile with the opportunity to obtain release on a showing of rehabilitation and maturity." (*Caballero*, *supra*, 55 Cal.4th at p. 269, fn. 5.) The Legislature responded by enacting section 3051, the express purpose of which is to provide a parole eligibility mechanism in accordance with the decisions in *Miller*, *Graham*, and *Caballero*. (Stats. 2013, ch. 312, § 1; see Historical and Statutory Notes, 51B pt. 2 West's Ann. Pen. Code (2015 supp.) foll. § 3041, pp. 78-79.)

Defendants claim the enactment of section 3051 does not cure the unconstitutionality of their sentences because the trial court has the duty of imposing, in the first instance, a sentence that does not violate the Eighth Amendment. We agree trial

to the date of the subsequent hearing. [¶] (h) This section shall not apply to cases in which sentencing occurs pursuant to Section 1170.12, subdivisions (b) to (i), inclusive, of Section 667, or Section 667.61, or in which an individual was sentenced to life in prison without the possibility of parole. This section shall not apply to an individual to whom this section would otherwise apply, but who, subsequent to attaining 18 years of age, commits an additional crime for which malice aforethought is a necessary element of the crime or for which the individual is sentenced to life in prison. [¶] (i) The board shall complete all youth offender parole hearings for individuals who become entitled to have their parole suitability considered at a youth offender parole hearing on the effective date of this section by July 1, 2015."

51.

courts have such a duty. (See *Caballero*, *supra*, 55 Cal.4th at pp. 268-269; cf. *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1386-1387.) This does not mean resentencing is required, however. Were we to remand defendants' cases, the trial court would be entitled to take into account enactment of section 3051. Defendants fail to convince us there is any reasonable possibility a remand for resentencing would result in them receiving an earlier parole eligibility date than is specified in that statute. Accordingly, a remand for resentencing would be an idle exercise that we decline to order in this day and age of limited judicial resources.

Defendants also say a parole hearing after the period of time specified in section 3051 is inadequate, because the passage of time may hinder their ability to find and produce favorable evidence. This is, of course, a problem faced by a number of offenders subject to lengthy incarceration before they become parole eligible. Again, however, defendants fail to explain how the trial court could — without imposing a sentence unauthorized by statute or clearly inappropriate for the serious nature of the offenses — devise a sentence that would render defendants eligible for parole earlier than section 3051 does. Moreover, we cannot help but note defendants could have — but did not — present such evidence at their sentencing hearings. (See, e.g., *People v. Palafox*, *supra*, 231 Cal.App.4th at pp. 75-78.)

Last, defendants complain there is no guarantee section 3051 will not be repealed or amended to their detriment, or that it applies to juvenile offenders who — like defendants — were sentenced prior to its effective date. Subdivision (i) of the statute appears to us to do away with any question of prospective-only application. Moreover, a defendant whose sentence violates the Eighth Amendment but for the provisions of section 3051 clearly would have the right to seek relief by means of a petition for writ of habeas corpus should section 3051 be repealed or unfavorably amended. (See *Caballero*, *supra*, 55 Cal.4th at p. 269.)

52.

**<u>DISPOSITION</u>**

The judgments are affirmed.

_____

DETJEN, J.

WE CONCUR:

_____

GOMES, Acting P. J.

_____

FRANSON, J.

53.